**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION**

CHRIS SENSABAUGH d/b/a                                                                          PLAINTIFF
SENSABAUGH INSURANCE AGENCY, INC.

v.                                              No. 1:05CV00046 JLH

FARMERS INSURANCE EXCHANGE;
TRUCK INSURANCE EXCHANGE; FIRE
INSURANCE EXCHANGE; MID-CENTURY
INSURANCE COMPANY; FARMERS NEW
WORLD LIFE INSURANCE COMPANY; and
FARMERS INSURANCE COMPANY, INC.                                                        DEFENDANTS

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Chris Sensabaugh brought this action for breach of contract in the Circuit Court of Independence County to recover money due under an agent appointment agreement from the defendants Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange, Mid-Century Insurance Company, Farmers New World Life Insurance Company, and Farmers Insurance Company, Incorporated (collectively "Farmers"). Farmers removed this case pursuant to 28 U.S.C. §§ 1332, 1441(b), and 1446, and Farmers filed a counterclaim for breach of contract. The case was tried to the Court on March 13, 2006.

**I.**

Sensabaugh worked as an insurance agent of Farmers in a district encompassing 13 counties in northern Arkansas and sold the classes and lines of insurance that Farmers offered from 1989 until 2002. Sensabaugh signed an agency appointment agreement in 1989 with Farmers. In Section A of that agreement, Farmers agreed to pay new business and service commissions to Sensabaugh; provide life and medical insurance to Sensabaugh; provide manuals, forms, and policyholder records

necessary for Sensabaugh to carry out the agreement; provide advertising assistance to Sensabaugh; and to make available to Sensabaugh education and sales training programs developed by Farmers. In return, Sensabaugh agreed in Section B to sell insurance for Farmers; to submit and place with Farmers every request or application for insurance for the classes and lines of insurance underwritten by Farmers; to provide facilities necessary to furnish insurance services to all policyholders of Farmers; to permit representatives of Farmers to review and examine agency records for the purpose of verifying compliance with the agreement; and to provide a fidelity bond in favor of Farmers.

Section C of the agreement contained provisions for terminating the agreement. Under Section C, the agreement could be terminated either upon the death of the agent; three months written notice by either Sensabaugh or Farmers; thirty days written notice by the non-breaching party in the case of a breach of the agreement; or immediately by mutual consent or Sensabaugh's embezzling of monies belonging to Farmers, switching insurance from Farmers to another carrier, abandoning of the agency, being convicted of a felony, or willfully misrepresenting to Farmers something that is material to the operation of the agency.

In addition to agreement provisions and termination provisions, the agency appointment agreement provided for the payment of "contract value" to Sensabaugh after termination of the agreement if certain conditions were met. "Contract value" in the agreement was based upon (1) the amount of service commissions paid to Sensabaugh on active policies during either the six-month or twelve-month period immediately preceding termination; (2) the number of Sensabaugh's active policies; and (3) Sensabaugh's number of years of continuous service as an agent for Farmers immediately prior to termination. Section G of the agreement described the conditions for payment of contract value:

> In the event of termination of this Agreement . . . the Companies will pay "Contract Value" to the agent or heirs in the manner hereinafter set out. In the event termination is because of embezzlement, there is no contract value.

Section G also contained schedules relating to computation of the contract value.

Section H of the agreement stated Sensabaugh's obligations to Farmers after termination. That section stated:

> The Agent agrees to transfer and assign all of the Agent's interest under this Agreement and Agency (including, at the request of the Companies, any interest in the telephone numbers and leased or rented office location) to the Companies at the time of payment or tender of payment to the Agent pursuant to Paragraph G of this Agreement. The Agent agrees to accept tender of Contract Value and further agrees that for a period of one year following the date of payment or tender of payment the Agent will neither directly or indirectly solicit, accept, or service the insurance business of any policyholder of record in the agencies of this district as of the date of payment or tender of payment.

> Section I of the "Agent Appointment Agreement" stated:

> The Agent acknowledges that all manuals, lists and records of any kind (including information pertaining to policyholders and expirations) are the confidential property of the Companies and aggress they shall not be used or divulged in any way detrimental to the Companies and shall be returned to the Companies upon termination of the Agency.

Section J provided that Sensabaugh was "an independent contractor for all purposes."

During his tenure with Farmers, Sensabaugh sold insurance for other companies as well as Farmers. Sensabaugh had customers whose only policies were written by Farmers, customers whose only policies were written by companies other than Farmers, and customers who had some policies written by Farmers and some policies written by other insurance companies. Farmers was aware that Sensabaugh served as an agent for other insurance companies and had no objection to his doing so, so long as he submitted to Farmers all of the applications that he received for classes and lines of insurance that Farmers would write. For example, Farmers does not write health insurance in

3

Arkansas and had no objection to Sensabaugh acting as an agent for other insurers who did write health insurance in Arkansas.

The district in which Sensabaugh was located included the following counties: Baxter, Boone, Carroll, Fulton, Independence, Izard, Jackson, Randolph, Searcy, Sharp, Stone, Van Buren, and White.  At all relevant times there were 19 Farmers agencies in the 13-county area.  The agents in each of those agencies were unrestricted by any geographical boundaries in soliciting, accepting, or serving policyholders.  Each Farmers' agent was free to solicit policyholders in any area of the state.  The parties stipulated that the total population of this district is 312,353.  In 2000, Farmers' market share was 7% in this district.

On a regular basis, Farmers' agents in Sensabaugh's district would hold district meetings. At these regular meetings, the district manager, Sensabaugh, and Sensabaugh's peers in the district would discuss such things as how many policies each agent had by line and by company; market share by particular zip code; profit and loss by line in each of the areas that Farmers wrote business; sales ideas among the district agents; business growth and ideas about staffing and how agents could grow their business; how to write certain lines of business; sales results; and how much business by line each agent was selling.  The agents would receive common training at these meetings.  They would discuss their problems with one another and exchange ideas on how to solve those problems.

On April 15, 2002, Sensabaugh notified Farmers via letter of his intent to resign as an agent of Farmers effective May 31, 2002.  Sometime before May 21, 2002, Sensabaugh downloaded from the Farmers' database information pertaining to his customers, including names, addresses, telephone numbers, policy numbers, and the like.  On May 21, 2002, Sensabaugh wrote the following letter to his customers:

4

Dear Farmers Group Policy Holder,

On June 1, 2002, I will no longer be representing Farmers Insurance Group.  Recent rate increases and other internal company issues have led me to make this change.

I am going to be an Independent agent.  That means that I will represent several different companies.  Some of you may already have policies with companies other than Farmers Group.  If you have a policy with one or more of the following companies, I will still be your agent.

I still represent the following companies:

| | |
|---|---|
| Farmers Home Mutual | Farmers Union Mutual |
| Town & Country Mutual | Home Mutual |
| American Modern Home | Progressive Insurance |
| Graham Rogers | Jaeger + Haines |
| Insurance Placement Center | U.P.A.C. |
| Harbor Excess and Surplus | 1st Auto Insurance |
| Safeco Auto Insurance | Travelers Insurance |
| Hartford Insurance | Farm & Home |

If you have any questions about this change, please feel free to call me.  My new office number is (870) 793-6391.

Sincerely,
*/s/ Chris Sensabaugh*
Chris Sensabaugh

On May 31, 2002, Sensabaugh's resignation became effective.  Farmers calculated that Sensabaugh's contract value under the agency appointment agreement was $117,738.  That amount was to be paid in three equal installments of $39,246.  In June 2002, Farmers paid Sensabaugh the first installment of $39,246.  Farmers withheld the last two installments, which were scheduled to be paid in November 2002 and May 2003.

Shortly after the time of his resignation, Farmers became aware that Sensabaugh had accepted

and serviced Farmers' policyholders in his former district, in violation of the noncompetition clause[1] contained in Section H of the agency appointment agreement. Sensabaugh testified that he had accepted business from less than 5% of the 2,200 policies Sensabaugh had serviced for Farmers, or fewer than 40 policyholders, and that the "vast majority" of those 40 policyholders also had insurance through Sensabaugh with companies other than Farmers on lines that Farmers did not write.

Farmers introduced into evidence Accord Cancellation Request forms signed by 55 of Sensabaugh's customers and submitted to Farmers in the summer and early fall of 2002 to cancel a total of 94 Farmers insurance policies. The evidence established that these cancellation notices were completed by Sensabaugh Insurance Agency, Inc. A comparison of the cancellation notices with the Master Policy List[2] of Sensabaugh Insurance Agency, Inc., shows that the vast majority of the persons who signed these cancellation forms are current customers of Sensabaugh Insurance Agency, Inc., with policies the expiration dates of which correspond to the dates that the Farmers' policies were cancelled. For example, Vivian Martin cancelled her Farmers' fire policy effective 9-4-02 and her Farmers' automobile policy effective 9-11-02. Sensabaugh's Master Policy List shows that Vivian Martin has a fire policy with Travelers Property Casualty with an expiration date of 9-4-06; and she has an automobile policy with Travelers Property Casualty with an expiration date of 9-11-06. It is apparent that Sensabaugh assisted Vivian Martin in cancelling her Farmers' policies and simultaneously replaced them with policies from Travelers in September 2002, barely more than

---

[1] The covenant in Section H is more than a nonsolicitation agreement but less than a classic covenant not to compete. This opinion will refer to it as "the noncompetition clause," recognizing that the clause did not prohibit all competition by Sensabaugh.

[2] Defendants' Exhibit 30B, filed under seal.

three months after he had resigned as a Farmers' agent.  Likewise, it is apparent that in the summer and fall of 2002 Sensabaugh assisted nearly all of the customers who signed the cancellation notices collected in defendants' Exhibit 29 in cancelling their Farmers' policies, and he replaced nearly all of the Farmers' policies with policies written by Farmers' competitors.  Farmers contends that because most policyholders do not complete an Accord Cancellation Request when cancelling a policy, the actual number of persons who cancelled a Farmers' policy and obtained a new policy through Sensabaugh during the first year after his resignation must be much greater than those shown in Exhibit 29, but that assertion is speculation.

Sensabaugh was the agent for some 2,200 Farmers' policies at the time of his resignation.

## II.

Farmers argues that Sensabaugh breached the agent appointment agreement when he violated the noncompetition clause in Section H of the agreement.  Because of Sensabaugh's violation of Section H, Farmers argues that it is discharged from the obligation to pay Sensabaugh the rest of the contract value and that it is entitled to recover the portion of the contract value already paid plus damages for lost profits on the accounts that Sensabaugh improperly switched from Farmers during the first year after his resignation.  In response, Sensabaugh argues that the noncompetition clause in Section H is overly broad and therefore unenforceable.  He argues that the noncompetition clause would prohibit him from advertising for one year because an advertisement could be seen by Farmers' policyholders and therefore would be a solicitation of them; and he argues that the geographical restriction is overly broad.

Under Arkansas law, the party challenging the validity of a covenant not to compete has the burden to show that it is unreasonable.  *Dawson v. Temps Plus, Inc.*, 337 Ark. 247, 254, 987 S.W.2d

722, 726 (1999). Whether a covenant not to compete is unreasonable is a matter to be determined under the particular circumstances involved. *HRR Ark., Inc. v. River City Contractors, Inc.*, 350 Ark. 420, 430, 87 S.W.3d 232, 239 (2002). Arkansas courts do not view such covenants favorably, especially in the employment context, and will not enforce a covenant that merely prohibits ordinary competition. *See Bendinger v. Marshalltown Trowell Co.*, 338 Ark. 410, 418, 994 S.W.2d 468, 472 (1999); *Statco Wireless, LLC v. Southwestern Bell Wireless, LLC*, 80 Ark. App. 284, 291, 95 S.W.3d 13, 16 (2003). Covenants not to compete will not be enforced unless the covenantee has a legitimate interest to be protected by such an agreement. *Dawson*, 337 Ark. at 255, 987 S.W.2d at 727. Where the covenant grows out of an employment or other associational relationship, Arkansas courts have found an interest sufficient to warrant enforcement of the covenant only in those cases where the covenantee provided special training or made available trade secrets, confidential business information, or customer lists, and then only if it is found that the associate was able to use information so obtained to gain an unfair competitive advantage. *Duffner v. Alberty*, 19 Ark. App. 137, 139-40, 718 S.W.2d 111, 112 (1986). The test is whether the restraint imposed is no greater than is reasonably necessary for the protection of the covenantee and not so great as to injure a public interest. *Evans Lab., Inc. v. Melder*, 262 Ark. 868, 870, 562 S.W.2d 62, 64 (1978). Covenants not to compete ancillary to a sale of a business or profession with its goodwill are valid to the extent reasonably necessary for the purchaser's protection and are looked upon with greater favor than such an agreement ancillary to an employment relationship or a professional association. *Duffner*, 19 Ark. App. at 139, 718 S.W.2d at 112. Arkansas courts have rarely invalidated a noncompetition clause ancillary to the sale of a business or professional practice on the ground that the clause was overly broad. John R. Pagan, *Arkansas Courts and Covenants Not to Compete*, 12 U. Ark. Little Rock L.J.

57, 66 (1989-90).

Some version of the noncompetition clause at issue here has been used by Farmers at least since the early 1960s. The Court has found the following cases that interpret or consider the enforcement of this noncompetition clause or a predecessor version of it: *Farmers Ins. Exchange v. Cochrane*, No. ADV-2004-52, 2005 Mont. Dist. LEXIS 1133 (Dist. Ct. Sept. 12, 2005); *Farmers Ins. Exchange v. Sorenson*, 99 F. Supp. 2d 1000 (E.D. Wis. 2000); *Farmers Ins. Exchange v. Chamberlain*, 77 Or. App. 245, 712 P.2d 172 (1986); *Heston v. Farmers Ins. Group*, 160 Cal. App. 3d 402, 206 Cal. Rptr. 585 (1984); *Frackowiak v. Farmers Ins. Co.*, 411 F. Supp. 1309 (D. Kan. 1976); *Farmers Underwriters Ass'n v. Eckel*, 185 Neb. 531, 177 N.W.2d 274 (1970); *Farmers Underwriters Ass'n v. Reid*, 425 S.W.2d 247 (Mo. Ct. App. 1967). None of these cases found the noncompetition clause at issue to be overly broad. Not every case addressed the issue, and a number of the cases are distinguishable. However, Sensabaugh has cited no case holding that this noncompetition clause is overly broad, nor has the Court found one.

Farmers argues, correctly, that it has a legitimate interest in protecting itself from unfair competition by a former agent who has acquired confidential information and personal relationships on behalf of Farmers. *Owens v. Penn Mut. Life Ins. Co.*, 851 F.2d 1053, 1055 (8th Cir. 1988). A covenant that seeks to prevent unfair competition by a former agent who has built up personal relationships with customers must be narrowly tailored to apply only to the customer base that the covenantee has a legitimate interest in protecting. *Federated Mut. Ins. Co. v. Bennett*, 36 Ark. App. 99, 818 S.W.2d 596 (1991); *Girard v. Rebsamen Ins. Co.*, 14 Ark. App. 154, 685 S.W.2d 526 (1985); *Rebsamen Ins. v. Milton*, 269 Ark. 737, 600 S.W.2d 441 (Ark. Ct. App. 1980). In *Girard*, for instance, the court of appeals found that a covenant not to compete was narrowly tailored to

protect the employer's interest in preventing unfair competition where the covenant prohibited the employer's former insurance agent from soliciting or accepting business from only those customers whose accounts the agent had personally serviced. *Girard*, 14 Ark. App. at 159, 685 S.W.2d at 528. In contrast, the court of appeals in *Federated* held that a covenant not to compete was overly broad where for two years it prohibited a former employee from soliciting or accepting insurance business or insurance policies of any type from any of the company's policyholders and customers in the territory where the employee had operated. *Federated*, 36 Ark. App. at 103-04, 818 S.W.2d at 599. The restriction in *Federated* was overbroad because, unlike the restriction in *Girard*, it prevented the employee from selling insurance policies to the insurance company's policyholders in lines and classes of business that were not sold by the insurance company. *Id*. Thus, the restriction was broader than what was needed to prevent unfair competition and was therefore void. *Id*.

In construing a contract, the Court must, if possible, give effect to the intention of the parties, and that intention must be ascertained from the contract as a whole. *Schmitt v. McKellar*, 244 Ark. 377, 385, 427 S.W.2d 202, 207 (1968); *Sorenson*, 99 F. Supp. 2d at 1004. Section B.1 of the agreement states that the agent agrees:

> To sell insurance for the Companies and to submit to the Companies every request or application for insurance for the classes and lines underwritten by the Companies and eligible in accordance with their published Rules and Manuals. All business acceptable to the Companies and written by the Agent will be placed with the Companies.

This provision left Sensabaugh free to represent insurers other than Farmers for classes and lines of business that Farmers did not write, and he did so for most or all of the 13 years during which he represented Farmers. Section G.3 provided that Farmers could terminate the contract immediately if Sensabaugh were to switch customers from Farmers to another insurer, but the contract states no

sanction for Sensabaugh placing with another company classes and lines of business that Farmers did not write. Viewing the contract as a whole, and reading Sections B.1 and H together, it does not appear that the intention of the parties was to require Sensabaugh, after termination of his appointment with Farmers, to cease accepting or servicing classes and lines of business that Farmers did not write merely because the customer also had a Farmers' policy.

Sensabaugh also argues that Section H is overly broad because it would prevent him from advertising for one year because soliciting would include advertising. On Sensabaugh's argument, the contract would prevent an agent who resigned his Farmers' appointment from putting up a sign outside his business because the sign could be seen by Farmers' policyholders and therefore could be construed as soliciting those policyholders. The contract does not define *solicit* and does not say whether soliciting includes advertising. However, the intent of the agreement seems to be that an agent whose appointment was terminated would be permitted to continue in the insurance business but would not be permitted for one year to take or attempt to take from Farmers the business for which he or some other agent in the district was the Farmers agent. If so, it would be consistent with that intent for Sensabaugh to be allowed to advertise even though his advertisements might be seen by Farmers' policyholders. He could not accept or service the business of Farmers' policyholders of agencies in the district for insurance that Farmers would write, nor could he solicit them, but he could advertise. In fact, Sensabaugh testified that to comply with the provision prohibiting him from directly or indirectly soliciting Farmers' policyholders he did no mail or telephone solicitation for one year to make sure that he did not inadvertently solicit a Farmers' policyholder; and in his advertising he did not mention that he was a former Farmers' agent. Thus, Sensabaugh understood that the provision permitted him to advertise so long as he did not mention that he was a former

Farmers' agent or use the advertising to target Farmers' policyholders.  That is a reasonable interpretation of the clause.  It is consistent with the intent of the parties as ascertained by reading the agreement as a whole.  *Cf. Girard*, 14 Ark. App. at 159, 685 S.W.2d at 528 (upholding as reasonable a covenant that also prohibited directly or indirectly soliciting or accepting insurance business from the covenantee's clients).  Because the contract did not prohibit Sensabaugh from advertising, it was not unduly restrictive.

Nor is the geographical restriction unreasonable.  The evidence established that by attending district meetings Sensabaugh would gain confidential information about other agencies in the district.  Absent the restriction in Section H, he would be able to use that information to compete unfairly with agents who had disclosed to him, in district meetings, information that they would never disclose to a competitor or potential competitor.  The parties stipulated that Farmers' market share in the district was 7%.  Thus, in his first year after resigning from Farmers, Sensabaugh was free to solicit, accept, and service the insurance business of 93% of the potential customers in the district.  *Id.* at 159-60, 685 S.W.2d at 529; *Sorenson*, 99 F. Supp. 2d 1007.

The one-year length of the restriction also is reasonable.[3]  *Orkin Exterminating Co. of Ark. v. Murell*, 212 Ark. 449, 458, 206 S.W.2d 185, 190 (1947); *Sorenson*, 99 F. Supp. 2d at 1006; *Statco*, 80 Ark. App. at 299, 95 S.W.3d at 21-22.

In sum, the noncompetition clause in Section H of the agency appointment agreement is valid

---

[3] Section H provides that the one year runs from "the date of payment or tender of payment" of the contract value.  The preceding sentence states, "The Agent agrees to transfer and assign all of the Agent's interest under this Agreement and Agency (including, at the request of the Companies, any interest in the telephone numbers and leased or rented office location) to the Companies at the time of tender of payment pursuant to Paragraph G of this Agreement."  That transfer apparently occurred on May 31, 2002, or a few days thereafter, so the parties by their conduct have established that timeframe as the date of "tender of payment."

and enforceable.

Sensabaugh breached the noncompetition clause. During the summer and fall of 2002, Sensabaugh assisted approximately 55 policyholders in cancelling approximately 94 Farmers policies, and he then switched those customers to competitors. Farmers argues that Sensabaugh has thereby forfeited his right to payment of the contract value, though it wishes to avoid the use of the term *forfeit*. The agreement expressly provides, in Section G, "In the event termination [of the appointment] is because of embezzlement, there is no Contract Value." Nowhere does the agency appointment agreement state that in the event of a violation of the noncompetition clause, there is no contract value. The Court will not read into the contract a forfeiture provision that is not there. *Cf. Farmers Ins. Exchange v. Cochrane*, 2005 Mont. Dist. LEXIS 1133, at ** 8-10. Farmers could have designated some or all of the contract value as consideration for the noncompetition clause, but it did not. *Cf. Import Motors v. Luker*, 268 Ark. 1045, 1047-48, 599 S.W.2d 398, 399 (Ark. App. 1980). Likewise, Farmers could have stated that the contract value would be reduced if the noncompetition clause were violated, as the insurer had done in *Owens*, but it did not. *Owens*, 851 F.2d at 1054. Farmers argues that the contract value is payment for the book of business that it was to keep after termination of Sensabaugh's agency agreement. The evidence shows that Sensabaugh took less than 5% of that book of business. It would be inequitable to construe the agreement to require Sensabaugh to forfeit 100% of the contract value and pay damages to Farmers when Farmers received 95% of the book of business for which it agreed to pay. *Id*. at 1055.

The total contract value was $117,738, payable in three installments of $39,246 each. Farmers paid the first installment in June 2002, and it was to pay the remaining two installments in November 2002 and May 2003. Because the amount Farmers owed to Sensabaugh was a sum

certain, Sensabaugh is entitled to prejudgment interest. *Reynolds Health Care Services, Inc. v. HMNH, Inc.*, ___ S.W.3d ___, 2005 WL 3074207 (Ark. Nov. 17, 2005). The interest rate on the prejudgment interest will be 6%. *Emmenegger v. Bull Moose Tube Co.*, 324 F.3d 616, 624 (8th Cir. 2003); HOWARD W. BRILL, ARKANSAS LAW OF DAMAGES § 10:4 (5th ed. 2004). Prejudgment interest will accrue on the second installment of $39,246 beginning on November 30, 2002, and on the final installment in that same amount beginning on May 31, 2003.

Farmers introduced evidence to show that Sensabaugh's breach of the noncompetition clause caused damages of approximately $20,000. Sensabaugh objected that the damage calculation was based on hearsay. The Court has disregarded the hearsay in defendants' Exhibit 18 and refused to admit defendants' Exhibits 19 and 20. Those three exhibits represent the hearsay to which Sensabaugh objects. Disregarding those exhibits, the evidence was sufficient to prove that Sensabaugh's breach caused damage to Farmers for lost profits in the amount of $20,000. Damages will be awarded to Farmers in that amount. That amount will be offset against the amount that Farmers owes to Sensabaugh.

## CONCLUSION

The Court finds in favor of Chris Sensabaugh on his complaint and awards damages in the amount of $93,779.09 (including prejudgment interest). The Court finds in favor of Farmers on the counterclaim and awards damages in the amount of $20,000. Judgment will be entered in favor of Chris Sensabaugh in the amount of $73,779.09.

IT IS SO ORDERED this 20th day of March, 2006.

_J. Leon Holmes_ _____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE